OWEN LINSDAY, *plaintiff in error*, *vs.* THE PEOPLE OF THE STATE OF NEW YORK, *defendants in error*.

A court of oyer and terminer has the power, in its discretion, without distinction in respect to the character of the crime, to allow an accomplice to be called and used as a witness for the prosecution.

And after such discretion has been exercised, and the accomplice has testified, the exercise of such discretion should not be reviewed, upon a bill of exceptions.

If the accomplice is jointly indicted with the principal, a *nolle prosequi* may be entered, as to the former, and he may be examined as a witness against the latter.

After proof, by the testimony of an accomplice, of the commission of a murder on the 19th of December, and the removal of the body, by the prisoner, about ten o'clock the next evening, the prosecutor sought to corroborate this evidence by asking a witness, who was at a certain house near the scene of the murder, if he saw the prisoner pass along the highway about ten o'clock, on any evening in December. This was objected to, upon the ground that the testimony would not be corroborative unless the witness first fixed the

Linsday *v.* The People.

title.   *Held,* that the question was simply introductory or preliminary. That the proof was directed to an important and material fact tending to connect the prisoner with the commission of the crime, or the evening of its commission; and that it was not inadmissible because it was not, in its particulars, certain, positive or conclusive in establishing such fact.

That the evidence was proper for the consideration of the jury, and it was for them to pass upon its force and effect.

On a trial for murder, it is admissible to prove that the deceased had two watches, and how he usually carried them, and that one watch, in a buckskin case, such as he usually carried, was afterwards seen hanging up in the prisoner's bed-room; the object being to show that the prisoner had property that had previously belonged to the deceased.

Although the testimony of an accomplice, if fully believed, clearly establishes the guilt of the prisoner as the principal offender, and would justify a conviction; yet it is proper for the people, and they are bound, to make such other proof as they are able to make, in corroboration of such testimony.

They are entitled to give proof both of the facts and circumstances attending the commission of the crime, and also such as relates to the person of the prisoner, and connects him with the accomplice and with the commission of the offence.

An accomplice having testified that the murder was committed in a certain stable; *held* that the testimony of another witness, that he had examined said stable and found marks of blood on the face of the manger, on the stairs, and on boards and stringers therein, was proper; being general evidence corroborative of the accomplice's, in respect to the place and fact and circumstances of the murder.

*Held,* also, that the positive testimony of experts that they plainly discovered stains on chips taken from the floor-boarding of the prisoner's sleigh, composed of blood, and human blood, was admissible, as corroborative of the testimony of the accomplice, that a spot of blood was seen by him on the floor-boards of the prisoner's sleigh, after the removal of the dead body thereon.

When evidence is given and received, tending to prove a material fact, it is not the province of the court to strike it out, or exclude it from the jury, on the ground that it is not decisive, or that its weight has been impaired, or effectually destroyed, on cross-examination or otherwise.   Its weight is a question for the jury.

When evidence is objected to, and received under objection and exception, or provisionally, the judge, if doubtful as to its admissibility, may yield to the objection, and strike out the evidence; and if he does so, and directs the jury to disregard it, this takes the testimony out of the case, and the exception with it.

But when the evidence is received unconditionally, and without objection, the judge has no such power; and it would be error to strike it out, as against the party offering the evidence and injured by its exclusion.

Where a witness testifies to a palpable untruth, in the presence of the court, the power of the court to order the sheriff to take him into custody, for perjury, is undoubted.

It is a question of discretion with the court whether it will order him into custody, or direct other proceedings to be taken to punish him for the perjury. And with the exercise of that discretion a court of review has no power to interfere.

WRIT of error to the court of oyer and terminer of Onondaga county, upon a conviction of the plaintiff of the crime of murder in the first degree.

The facts of the case, so far as relates to the questions discussed and decided, are fully stated in the opinion.

The case is noted in 5 *Hun*, 104, but not reported in full. The case went to the Court of Appeals, where the judgment was *affirmed.* (*See* 63 *N. Y.*, 143.)

*Frank Hiscock* and *Hunt T. Weaver*, for the plaintiff in error.

*William C. Ruger* and *William James*, (district attorney,) for the people.

*By the Court*, E. DARWIN SMITH, J. The *corpus delicti* being fully proved and clearly established, the questions and exceptions relating to the identity of the body it can hardly be necessary to consider or discuss. None of the exceptions on this branch of the case have, I think, any substantial merit. The dead body was clearly identified as the body of Colvin, and the fact that he came to his death by violence was unquestionable and unquestioned.

The prominent and substantial issue remained, whether the prisoner committed the crime or participated in its commission. It is quite clear that the case before us presents no evidence which would have warranted the conviction of the accused without the testimony of the witness Vader, who confessed, and testified on the trial that he was an accomplice in the crime, and implicated the prisoner.

The exception to the decision of the court allowing the said Vader to become a witness for the people presents the first substantial question for our consideration.

The said Vader being indicted with the prisoner in the same indictment, it became necessary, or was deemed proper, by the court of oyer and terminer, to allow the district attorney to enter a *nolle prosequi* as against him, on said indictment, and he was then sworn and improved as a witness on the part of the people.

The court of oyer and terminer undoubtedly had the power, in its discretion, to allow the people to call and use Vader as a witness against the prisoner.

His acceptance and use as a witness for the people implied, if the same was not in fact given or made, an assurance on the part of the state, under the sanction of the court, that he should not be prosecuted, or should be pardoned, for his participation in said crime. The counsel for the prisoner objected and excepted to this exercise of its power by the court of oyer and terminer, and insisted that it ought not to be exercised in favor of an accomplice in a capital case.

The instances, I think, are quite rare in this country where an accomplice in the commission of a murder has been received and used as a witness by the people. Judge Woodworth, in the case of *The People* v. *Whipple* (9 *Cowen*, 713,) mentions a case within his personal knowledge where one Jack Hodges, a negro, had been convicted of murder of one Jennings, and who, before sentence, was called and used as a witness for the people on the trial of David Conkling as an accomplice before the fact, in the same murder. On his testimony, chiefly, two persons were convicted in the oyer and terminer of Orange county and executed, and Jack was pardoned by an act of the legislature. In that case—*The People* v. *Whipple*—the application was to allow the people to use Strang who had been convicted as principal in the murder of Whipple, as a witness against Mrs.

Whipple, charged as an accessory. This application was refused, on the ground that Strang was the real guilty party and the court ought not to allow him to be a witness upon the implied pledge that he should be pardoned, which would be involved in receiving him as a witness.

In that case Judge Duer states what I think is the received and recognized rule and practice in the court of oyer and terminer, and has been, ever since it existed as the great court of the common law of original criminal jurisdiction, and in other criminal courts, viz.: that, upon the application of the prosecuting officers, and without distinction in respect to the character of the crime, the court has the power, in its discretion, whenever it is of the opinion that it will promote the ends of public justice, to allow an accomplice to be called and admitted to be sworn and used as a witness for the prosecution.

Upon the representations made by the district attorney to the court, in his opening to the jury and otherwise, in respect to the general character and position of Vader as contrasted with that of the prisoner, and their relation to each other, and the simplicity and frankness with which he confessed his part in the murder, and stated all the facts relating thereto, I think the court in its discretion was justified in allowing the district attorney to call and use him as a witness in the cause, against the prisoner. But if there was any question on this point, I do not think, after the discretion has been exercised and the accomplice has fulfilled his part of the agreement with the people to give full and explicit testimony in the cause, that the court ought, if it had the power, upon exceptions, to review such discretion. We have not been referred to any case in which a court of review has reversed or reviewed the decision of the court of oyer and terminer or other court upon such a question.

The people having proved by the witness Vader the perpetration of the murder by the prisoner on the morning of the 19th of December, 1873, and that he removed the dead body on the ensuing evening, about 10 o'clock, with the assistance of the witness, upon a bob-sled drawn by his span of horses and sunk it in the Seneca river where the same was subsequently found, sought to corroborate the witness by the testimony of Freeman Moore, who, having testified that he was at the house of Martin Weaver situated upon the highway between the house of the prisoner and that of Daniel Linsday, his father, where the alleged murder was committed, was asked if he saw the prisoner pass along said highway about ten o'clock on any evening in December. The counsel for the prisoner objected to the witness answering the question whether he saw the prisoner pass along said road on any evening when he was at the house of said Weaver, unless he first fixed the time; upon the ground that it would not be corroborative of the evidence of Vader. The objection was overruled, and the prisoner's counsel excepted.

The same objection and exception, in substance, was repeated in respect to the testimony of three other witnesses upon the same subject, and to the refusal of the court to strike out this testimony as too remote and furnishing no corroborative proof.

These exceptions are none of them well taken. The question objected to was simply introductory or preliminary. The proof was directed to an important and material fact tending to connect the prisoner with the commission of the crime on the evening of its commission, and was not inadmissible because it was not in its particulars certain, positive or conclusive in establishing such fact.

The evidence offered was proper for the consideration of the jury, and it was for them to pass upon its force and effect. The people sought to show, and the witness

subsequently testified, that the evening was the 19th of December according to his best recollection from the date and particulars mentioned by him.

The objection that the constable who arrested the defendant said he looked pale, at the time when apprised that he was arrested on the charge of murder, is not well taken. The answer was not responsive to the inquiry put to him, and was not embraced in the ruling by the court at the time, that he might " state any of the facts pertaining to the conduct of the prisoner," and the answer afterwards made was not excepted to.

The exceptions referred to in the defendant's 19th and 20th points are not well taken. It was clearly admissible to prove that the deceased had two watches, and how he usually carried them, and that one watch in a buckskin case, such as he usually carried, was afterwards seen hanging up in the prisoner's bed-room.

The object of this proof was to show that the prisoner had property that had previously belonged to Colvin. The court could not exclude the evidence. Its force and effect are a circumstance belonging to the jury.

The testimony of the witness Vader, if fully believed, clearly established the guilt of the prisoner as the principal offender, and would justify a conviction; but as it is generally unsafe and juries are uniformly advised not to convict upon the uncorroborated testimony of an accomplice, it was proper for the people, and they were bound, to make such other proof as they were able to make in corroboration of such testimony. They were entitled to give proof both of the facts and circumstances attending the commission of the crime, and also such as related to the person of the prisoner, and connected him with the accomplice and with the commission of the offence. (*Wharton's Crim. Law*, sec. 187. *Roscoe's Crim. Ev.*, 122. 1 *Phil. Ev.*, 115, 5*th Am. ed.*)

The witness Vader had testified that the crime was

committed in the cow stables of Daniel Linsday, father of the prisoner. The evidence offered and given by the witness Toll, that he examined said stables and found marks of blood on the face of the manger, on the stairs, and on boards and stringers therein, was therefore proper, and the exceptions thereto not well taken. This was general evidence corroborative of Vader's, in respect to place and fact and circumstances of the murder. The witness Vader testified that on the night of the 19th of December, after the body had been deposited in the river and they had returned to defendant's house, and the prisoner had unhitched his team from the sleigh, he saw blood on the sleigh, right where Colvin's head lay, about in the middle of the sleigh, on the boards — the bottom board of the sleigh. "The spot was over a foot in bigness, he should say."

It appears that after the arrest of the prisoner the boards were taken off from said sleigh, and chips cut from the stained spot found on them, and also chips were cut from boards of the floor and manger of the barn where it is alleged the murder was committed, and also from a step of the stairs up which he was taken to the hay-loft above, and these chips sent to Philadelphia and delivered to Professor Richardson, a microscopist in the Philadelphia Hospital, for examination and experimenting for the purpose of determining whether they were stains of human blood. Professor Richardson was called as a witness and asked to state the process and results of his examination of said chips. This was objected to by the defendant's counsel, on the ground that the said stains, whatever they may have been, upon the wood of these boards, had been a long time out of the possession of the defendant, and used and controlled by other persons. The objection was overruled, and the defendant's counsel duly excepted. This exception, I think, was not well taken.

These boards were taken possession of by the public

officers on the 26th of June, 1874, after the arrest of the defendant, and their possession after that time was fully explained and accounted for by the said officers and other witnesses, and before the arrest they were under the control of the defendant. All the circumstances relating to their possession and use by the defendant and others before the arrest, and of their custody and care afterwards, were proper subjects for the consideration of the jury, in respect to the weight of the testimony based upon an examination of the chips taken therefrom and of the boards themselves, also examined by the witness and others. The court could not exclude the testimony of Dr. Richardson, called as an expert, to make a microscopic and chemical examination of the spots remaining on said boards and upon the chips produced. The testimony of this witness and also of Professor Fowler, who concurred with him, that they plainly discovered and found the stains on the chips taken from the floor-boarding of defendant's sleigh, composed of blood, and human blood, was positive as to the fact, and was clearly admissible as corroborative of the testimony of Vader that a spot of blood was seen by him as above stated upon the floor-boards of the defendant's sleigh, after the removal of the dead body on the 19th of December.

No error was committed by the court in receiving the testimony of the witness Morris that $300.00 was paid to his bank by the prisoner, on his note at said bank, due on the 27th of December. He testified to such payment at first positively, and afterwards, on further and cross-examination, rendered the fact or amount and time of such payment quite uncertain. The judge ruled that the weight of his testimony belonged to the jury, and denied the motion of the defendant's counsel to strike out the evidence. This was clearly correct. When evidence is given and received tending to prove a material fact, it is not the province of the court to strike

it out, or exclude it from the jury, on the ground that it is not decisive, or that its weight has been impaired or effectually destroyed on cross-examination, or otherwise.

The same observations apply to several other exceptions to the refusal of the judge to strike out other testimony, and particularly to the testimony of the witness Baker, in respect to the time of the delivery of the oats by Vader and Daniel Linsday. Baker testified that he was in the employ of one Jones as his miller, and knew Vader and Daniel Linsday, and knew of them drawing oats to the mill of Jones in December, 1873, and weighed the oats and took them in, and remembered the occasion when the last load was drawn, and that it was raining. The counsel for the people claimed that this day was Thursday the 18th. The witness was asked if he remembered what day of the week or month it was. The witness answered that he did not know — was not positive — had no memorandum that showed the day, and was then asked what his best recollection was of the day the last load of oats was drawn there. This question was objected to, and not answered, and he was then asked by the court if he had referred to any memorandum made by himself, and he answered that he had referred to the book that belonged to the mill; some of it was his, and some of it was Mr. Johnson's. He was then asked if, having refreshed his recollection by reference to those books, he could then state the day the last load of oats was drawn. Then the counsel for the defendant objected to his consulting any memorandum not made by himself. The court sustained this objection to the question, and the witness answered: "It was from the date of the check given in payment for the oats. I think the last load of oats was drawn a day or two previous to the date of the check; that is my recollection. The check was given subsequent to the delivery of the oats. I can't say positively, but I think a

day or two before that, the oats were delivered." The witness gave further testimony, and was then cross-examined, and stated that he did not draw the check or see it drawn or delivered ; had no personal knowledge of it ; that all his knowledge was from the date of the check. He stated that he had seen the check and had it in his possession and knew its date. The witness was further examined and cross-examined, and at the close of his evidence gave considerable testimony in respect to the delivery and weighing and sending off of the oats, and the persons present. The counsel for the defendant then moved that his evidence on the question of when the last load of oats was delivered be struck out; which was denied. This, I think, was not erroneous. The witness had given considerable testimony on that point, aside from the check, relating to the circumstances attending the receipt and shipment of the oats, that could not properly have been stricken out. All that he really professed or was allowed to state on that point was upon his recollection, and it does not appear from his testimony at what precise time the last load of oats was in fact delivered. He stated, however, some facts which, in connection with other testimony, may have tended to fix such time — and this is the nature, in a large degree, of all evidence. It is made up of various items and particulars derived from different sources and witnesses, and the aggregate force of these several particulars or circumstances constitutes reliable evidence, and establishes facts. A judge may doubtless, during the progress of a trial, where evidence is objected to and received under objection and exception or provisionally, and he is doubtful as to its admissibility, yield to the objection and strike out the evidence, as the judge did in this case in respect to part of the testimony of the witness Moore, who had, in response to a general question in respect to the conduct of the prisoner, answered that he smoked quite excessively, more than usual, in the month of De-

cember. Immediately after this answer, the judge said he did not think he should allow a general criticism into the habits of the prisoner, and he was inclined, if the prisoner's counsel desired, to have the evidence stricken out, and that it might be struck out. The counsel replied that they preferred to have it stand, with their exceptions. The judge thereupon directed it stricken out, and at the same time directed the jury not to regard it.

This, I think, took the testimony out of the case, and the exception with it.

This practice was sanctioned in the case of the *People* v. *Parish*, (4 *Denio*, 156,) in which Judge BRONSON said: "It was not unusual for a judge to correct an error into which he may have fallen in the admission of evidence, by striking the testimony out of his minutes and telling the jury to disregard it. When that is done the exception which was taken to the evidence should fall to the ground."

But when the evidence is received unconditionally and without objection, the judge has no such power, and it would be error to strike it out as against the party offering the evidence and injured by its exclusion. (*Hall* v. *Earnest*, 36 *Barb.*, 591. *The People* v. *Stevens*, 4 *Parker*, 396.)

The witness Vader testified that the boat obtained from a Mrs. Crego, and used to carry the body of Colvin to the centre of the river, he returned on Saturday, the 20th, and that he rode part of the way on that occasion towards Baldwinsville with Daniel Linsday, the father of the prisoner, and arrived at Baldwinsville about two o'clock that day. Daniel Linsday, on the defence, testified that he went to Baldwinsville on Saturday, with him, on a load of oats, and that he went there also on the following Tuesday, the 23d, in a cutter, and Vader went with him on this occasion and got out at the cross road leading to Mrs. Crego's, and said he was going

there, and did not see him at Baldwinsville afterwards, on that day. The people called witnesses to show that Linsday and Vader were together at Baldwinsville at the time stated by Vader, and were allowed to prove by a witness that he saw them there together a day or two before Christmas. This tended, in some degree, to show that Vader was correct in his testimony that it was Tuesday, the 23d, when he and Linsday went together to Baldwinsville. It was a slight and inconclusive circumstance, but I do not think it was erroneous to admit it; and if it were, it was a trivial error and not of the slightest consequence.

It appears that at the close of the testimony of John Vader, a witness called on the part of the defence, the court ordered the sheriff to take him into custody for perjury. This witness testified that he was at the house of his daughter, Mrs. Spore, on the evening of the 21st of December, at her birth day party, and to fix the time of the party, produced a bible, and testified that it was the family bible and contained the record of her birth; that the bible had been in the family forty years, and that his daughter was born the 21st of December, 1833. The witness testified that he saw Francis Colvin at that party on the evening of the 21st, and had conversation with him. The witness testified, also, that the entry in the bible was made with his knowledge and in his presence, soon after the birth of his daughter.

It appeared, upon examination of the bible thus produced, that upon its title page it purported to have been published in 1843, ten years after the birth of said daughter. The court asked the witness if he had any explanation to make in respect to these facts thus appearing; and as he made no satisfactory explanation, the court ordered him into custody for perjury. The power of the court to make such order is undoubted. (2 *Rev. Stat.*, 702, § 5. *Bishop's Crim. Proceed.*, § 229.)

The witness had testified to a palpable untruth in the

presence of the court, and it was a question of discretion with the court whether it should order him into custody or direct other proceedings to be taken to punish him for the perjury. With this discretion this court, as a court of review, has no power to interfere. This fact was just as patent to the jury as to the court, and we can hardly imagine that the action of the court in respect to it would be likely to have or produce any effect upon their minds injurious to the prisoner.

Of the very numerous objections and exceptions taken by the prisoner's counsel during the progress of this trial, I have thus taken up and considered all those pointed out and particularly described in the briefs of the counsel for the prisoner, and have been unable to come to the conclusion that any substantial error occurred on the trial to the prejudice of the prisoner, or any error of sufficient consequence, at most, to justify this court in reversing the judgment of the oyer and terminer.

The right of review in the superior courts of the state, of the proceedings in criminal cases in the courts exercising original criminal jurisdiction, is of much public consequence and a great security to persons accused of crime. It doubtless secures to them, in many cases, a much fairer and more careful trial in the subordinate court than they would otherwise have; but it would be a reproach to the law and to the administration of public justice tending to make the conviction of high offenders difficult, if not virtually impracticable, in many cases, if the patient and laborious work of weeks in the investigation of crime, by courts and juries, should be brought to naught and overruled in the courts of review, except upon clear, palpable and substantial grounds of error.

We think the judgment in this case, rendered in the court below, was not erroneous; and that it should be affirmed, and the record and proceedings remitted to

the court of oyer and terminer of the county of Onondaga, to carry such judgment and conviction into effect.

Judgment affirmed.

[FOURTH DEPARTMENT, GENERAL TERM at Buffalo, June, 1875. *Mullin, E. Darwin Smith* and *Gilbert*, Justices.]